

**SO ORDERED,**

**Judge Katharine M. Samson**
**United States Bankruptcy Judge**
**Date Signed: March 30, 2022**

_____

**The Order of the Court is set forth below. The docket reflects the date entered.**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **IN RE:  KIMBERLY WALKER OCHELLO** | **CASE NO. 20-00717-KMS** |
| **DEBTOR** | **CHAPTER 7** |
| **LELAND LOU** | **PLAINTIFF** |
| **V.** | **ADV. PROC. NO. 20-00027-KMS** |
| **KIMBERLY WALKER OCHELLO and GOLDEN WALKER HOMES LLC** | **DEFENDANTS** |

### OPINION ON NONDISCHARGEABILITY

This matter came on for trial on Plaintiff Leland Lou's complaint against Debtor-Defendant Kimberly Walker Ochello,[1] objecting to the dischargeability of a debt under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6).[2] This proceeding is core under 28 U.S.C. § 157(b)(2)(I).

---

[1] The accompanying judgment against only Ochello resolves the adversary proceeding. Co-Defendant Golden Walker Homes LLC has been administratively dissolved by the Mississippi Secretary of State. Stip. Fact No. 7, Pretrial Order, ECF No. 29 at 3. Its no-asset chapter 7 case has been closed. *See In re Golden Walker Homes LLC*, No. 20-00722-KMS (Bankr. S.D. Miss. filed Feb. 28, 2020; closed July 27, 2020). And in any event, a corporate chapter 7 debtor does not receive a discharge. 11 U.S.C. § 727(a)(1) ("The court shall grant the debtor a discharge unless . . . the debtor is not an individual . . . .").

[2] The pretrial order also included counts for denial of discharge under § 727(a)(2), (a)(4), and (a)(5). *See* ECF No. 29 at 2. But at trial and in his post-trial briefs, Lou pressed only the § 523(a) counts objecting to discharge of a particular debt. As a result, the request for denial of discharge under § 727(a) has been abandoned. *See Faulkner v. Kornman (In re Heritage Org., L.L.C.*, 466 B.R. 862, 881 (Bankr. N.D. Tex. 2012) ("Courts routinely find claims abandoned when they are not pressed at trial or in post-trial briefing.").

This dispute resulted predictably when both parties ignored the maxim to never mix business with pleasure. Lou, a physician, became romantically involved with Ochello, a nurse he had met a couple of years earlier when she and a co-worker called on his office to market the services of their employer, a local home health care company.

After the romance began, Ochello and her co-worker, Lucy Barnes, approached Lou with the idea of opening and operating a personal care home. Lou agreed, and he supplied all the funding for Golden Walker Homes LLC ("Golden Walker"), the limited liability company that Ochello and Lucy created one evening from a computer at Lucy's home. Golden Walker bought real property for the planned personal care home and began paying for its renovation and furnishings.

Soon, the romantic relationship soured, and on its heels, the business relationship. The personal care home never opened, both Ochello and Golden Walker filed chapter 7 bankruptcy cases, and Lou ultimately bought the real property from Ochello's bankruptcy estate.

Now Lou wants $155,560 of the $258,000 he says he invested in Golden Walker and the $7000 he says he loaned Ochello held nondischargeable in Ochello's bankruptcy case. Based on the evidence adduced at trial and the arguments in the post-trial briefs, Ochello owes Lou a nondischargeable debt of $14,739.64.

## FINDINGS OF FACT

### I. Witnesses

Four witnesses testified: Lou; Ochello; Lucy; and Lucy's husband, Damon Barnes. Lucy mostly described her participation and the division of duties in Golden Walker and what she knew of Lou and Ochello's personal relationship. Although she and Ochello had been "besties, good

friends," they were estranged by the time of the trial. Tr. 2, ECF No. 41 at 7. [3] Her testimony about Ochello was neutral to hostile. Damon spoke as a mostly uninvolved observer of some of the meetings in which Lucy, Lou, and Ochello discussed their business plans. Whereas Lucy's and Damon's testimony was limited in scope, Lou's and Ochello's was wide-ranging, veering more than occasionally into irrelevance to the issues.

Ochello was believable; Lou was not. Though her answers were often disorganized and her demeanor discomposed, Ochello's testimony about her personal relationship with Lou and about what became of his money was mostly consistent and seemingly guileless. For example, she unabashedly admitted using Golden Walker money to pay her personal expenses. *See* Tr. 1, ECF No. 40 at 162 (Atty: "Where was that money spent?" Ochello: "Probably for living arrangements."). In contrast, Lou was often evasive, as when presented with a check written on Golden Walker's account for his apartment rent. *See* Tr. 1 at 62. Also, Lou minimized how deeply involved he was with Ochello. For example, when asked at what point in time he was "cohabitating" with Ochello, he answered, "If there was a period that would be called cohabitating it probably would be from 2016, or 17 at most, but that was, I wouldn't call it cohabitating at all. I maintained a residence the entire time." Tr. 1 at 13. And later, when asked whether there was a period when he stayed at Ochello's house more than one night at a time, he denied ever staying twenty-four hours except for "several times maybe" when he house-sat. Tr. 1 at 76.

## II. Facts

### A. Friends, Lovers, and Business Partners

Long before Lou entered the picture, Ochello and Lucy were friends. At the time the following events occurred, they had worked together at the home health care company, Deaconess

---

[3] "Tr. 2" refers to the transcript of the second day of the two-day trial; "Tr. 1" refers to the transcript of the first day.

HomeCare, for approximately six years. Tr. 2 at 9. Ochello had an associate's degree in nursing and did marketing and sales. Tr. 1 at 98, 99. Lucy was working toward her post-graduate nurse practitioner's degree, Tr. 1 at 16, and was a clinical liaison, Tr. 2 at 6.

Sometime in 2014 or 2015 during discussions they had in the car, Lucy and Ochello "just kind of stumbled upon the idea" of opening a personal care home. Tr. 2 at 8-9. At about this same time, they became acquainted with Lou, an anesthesiologist with a subspecialty in pain management, when they visited his office to market Deaconess's services. Tr. 1 at 12, 13. For the first couple of years Lou and Ochello knew each other, their relationship apparently was purely professional.

Then, in February 2017, Ochello and her husband divorced. Tr. 1 at 96. In June, she and Lou began texting, and by the end of July, they were romantically involved. Tr. 1 at 171. "Very quickly," Lou began staying overnight at her house. *Id.* By the time the relationship ended in October 2018, his belongings filled a walk-in closet. Tr. 1 at 172. And his office nurse, Morgan, would call Ochello to get Lou up in the morning for work. Tr. 1 at 147.

Early on, Lou gave Ochello non-trivial amounts of money. In late-August 2017, she asked him for help with "medical expenses." Tr. 1 at 18-19. He wrote her a check for $750, noting "medical" in the memo line. *See* Lou Ex. 1, ECF No. 27 at 4. Ochello testified that the money "[c]ould have been [for] my Botox," but she was not sure. Tr. 1 at 187. According to Lou, he did not expect Ochello to repay him. Tr. 1 at 19. Two days later, he wrote her a check for $3500, noting "ring purchase" in the memo line. *See* Lou Ex. 2, ECF No. 27. Lou testified that he knew Ochello was trying to sell her wedding ring because she needed money, and he collected jewelry, so he bought it from her. Tr. 1 at 20. Lou "believe[s]" he took possession of the ring that day. Tr.

1 at 82. But Ochello credibly testified that the ring did not leave her house until the couple's breakup more than a year later. Tr. 1 at 172.

Sometime after Lou and Ochello became romantically involved, Ochello and Lucy approached Lou with their personal care home idea. Tr. 1 at 14. Lou was intrigued. With Lucy in the process of obtaining a mid-level nursing degree and himself as a physician who would work hands on, he thought they could "make it a little more of a higher end type of personal care home." Tr. 1 at 16. In November 2017, Ochello and Lucy began looking for a suitable piece of real property. Tr. 1 at 105.

Meanwhile, Lou's generosity toward Ochello continued. According to Ochello, he treated her "like a queen." Tr. 1 at 146. They traveled; he bought her gifts. Tr. 1 at 146, 203.

On Christmas morning 2017, Lou gave Ochello an engagement ring. Tr. 1 at 102-03. A month later, Ochello lost her job. Tr. 1 at 198.

After Ochello became unemployed, Lou's generosity increased. *See* Tr. 1 at 203 ("He bought me some gifts, but, I mean, not to the extent of when I lost my job and we became more serious in our relationship . . . ."). They flew "multiple times" to Dallas. Tr. 1 at 108. In February 2018, he took her to Miami for ten days in conjunction with a pain treatment conference. Tr. 1 at 189. He also flew Lucy there for the weekend so Ochello would not be lonely while he was in meetings. *Id.* He also helped significantly with her ongoing expenses, paying her daughter's school tuition for the year, her house note, some of her car note, and several months of her $600 health insurance premiums. Tr. 1 at 197-98.

Ochello's job loss accelerated the plan to open a personal care home. Tr. 1 at 16. Because she was not otherwise occupied, Ochello took responsibility for most of the day-to-day tasks necessary to get the business up and running. Tr. 1 at 17 (Lou: "We expected her basically to [do]

the leg work for us while we were both working."). A spare room in Ochello's home became the office. Tr. 1 at 21-22. Lou, Ochello, and Lucy would meet there to discuss the business and "stay on top of things." Tr. 1 at 23-24.

Lou's role was to provide financing. See, e.g., Tr. 2 at 30 (Lucy: "[H]e loaned us the money up front to establish the business."). But in February 2018, the business that would become Golden Walker had no bank account. So Lou began writing checks for Golden Walker to Ochello.

### B. Golden Walker

The first ostensibly business-related check, written a little more than a week after Lou and Ochello's return from Miami, was for $4000 with the notation "working capital" in the memo line. Stip. Fact No. 1, Pretrial Order, ECF No. 29 at 3. According to Lou, this money was for routine start-up expenses. Tr. 1 at 21 ("[W]e needed to get a printer, we needed to get a computer, office supplies, and to start paying for expenses, paying for gas if they were . . . travel[ing] to look for a home . . . ."). Ochello did not take the "working capital" notation seriously. Tr. 1 at 109 ("I mean, he paid my child's schooling. I mean, we were in a personal relationship, yes. I mean, he would put this—I asked him many times why do you put this in the memo line. I mean, he did that for everything that he was involved with.").

By early-April 2018, Lucy and Ochello had found two pieces of real property, either of which they thought would be suitable. Tr. 1 at 24. Lou, Lucy, and Ochello, decided on the property at 1725 24th Avenue ("the Home"). Tr. 1 at 25.

At this point, spending began in earnest. And although Ochello would be writing most of the checks, Lucy was with her every step of the way. Tr. 2 at 13 (Lucy: "I was there with her on purchasing the home, getting the business started, setting up the accounts at the banks. We—this was a team effort.").

On April 5 and April 11, Ochello wrote two checks on her personal account to Archer Architecture PLLC, one for $300 and another for $1500. Ochello Ex. 3, ECF No. 28 at 43. Corresponding to the $1500 check is a $1500 check written on Lou's account to Ochello, dated August 12, 2018, but with a bank capture date of April 11, 2018. Lou Ex. 24, ECF No. 27 at 40. The memo line on the check says "Architect/[Illegible]."

Ochello wrote and signed the $1500 check, and Lou makes much of this fact. Ochello testified, "We needed money for Mr. Archer," and that she and Lucy were in the bank drive-thru when she called Lou and he gave his permission. Tr. 1 at 110. According to Lucy, Ochello did not call Lou, but Lucy confirmed that the money was needed to pay the architect. Tr. 2 at 38. Lou denies authorizing anyone to sign the check. Tr. 1 at 88. But Lou's $1500 was fully accounted for by the $1500 check that Ochello wrote to Archer the next day.

On April 16, Lou wrote Ochello a check for $2500 with the notation "For real estate purchase" in the memo line. Stip. Fact No. 3. The next day, Ochello wrote Winstead Realty a check for $1000 with the notation "1725 24th Ave Earnest Money personal care home." Ochello Ex. 4, ECF No. 28 at 62.

On the personal front, Lou testified that by this time, his romance with Ochello was over. Tr. 1 at 76-77 ("When did it end? When we started doing business, and it was actually already dying before then because I don't like to mix business and pleasure."). No evidence even suggested that Lou's conduct toward Ochello changed in the spring of 2018.

 On April 18, 2018, Lucy and Ochello filed a certificate of formation for Golden Walker Homes LLC on the Mississippi Secretary of State's website. *See* Stip. Fact No. 4. They were at Lucy's house, with Lucy at the computer. Tr. 1 at 118; Tr. 2 at 26 (Lucy: "I believe [Ochello] was

[there]. We pretty much did everything together."). They put the filing fee on Ochello's credit card. Tr. 1 at 118.

Ochello was familiar with the online filing process; she and Lou had created an LLC in November 2017. Tr. 1 at 121 ("We were on our couch that he purchased for us, and we formed one. He wanted me to start a business as far as he wanted to do drug samples, urine drug screening . . . . And he was going to run them through his clinic and be reimbursed for them.").

Despite this previous experience, Ochello had no idea what she was doing and neither did Lucy. They apparently did not understand the meanings of the terms "registered agent," "member," and "manager." As Registered Agent, they listed Ochello—at Lucy's address. Tr. 1 at 120 (Ochello: "We were at her home."). They identified Ochello as Member and Lucy as Manager. Tr. 1 at 120 (Ochello: "[W]e had difficulty—we didn't know what to put on that."). They combined their six initials and "2018" to create a business email address at gmail.com. Tr. 1 at 118.

The Certificate of Formation is the only documentary evidence of Golden Walker's existence. There was no written operating agreement. When asked why, Lou blamed Ochello and Lucy. Tr. 1 at 37 ("Well, her and Lucy had tried to do it on their own and went to the Secretary of State website I think to open up the LLC without us hiring an attorney . . . I asked them to come back and get a lawyer to do it properly, but that wasn't done."). Damon Barnes gave the more credible explanation that "it just didn't get to that point. Everything kept getting pushed off." Tr. 2 at 55.

Notwithstanding the absence of a written operating agreement, Lou, Ochello, and Lucy shared certain understandings about Golden Walker and their respective roles. First, they would create the business together. Second, Lou would be the "silent partner" who put up all the money. Tr. 2 at 56 (Damon: "He really wanted as much hands off as possible. He was trying to, you

know—he wanted to be in the background, very much background."); Tr. 2 at 29 (Lucy: "He was a silent partner in that he gave us money to establish the company."); Tr. 1 at 16 (Lou: "Initially, [my role] was basically the financier."); Tr. 1 at 118 (Ochello: "[Lou] wanted his name on nothing."). Third, Lou would be repaid from Golden Walker's profits. Tr. 2 at 15 (Lucy: "We were trying to establish . . . how we would pay Mr. Leland back after a ten-year period.")

But there was no shared understanding about other questions, first and foremost, the division of ownership. When asked whether Lou had an interest, Ochello answered, "In me." Tr. 1 at 119. Damon testified that at a meeting about the business in July 2018, he came up with the idea of a 40% interest for Lou and 30% each for Lucy and Ochello, and "they all agreed on it." Tr. 2 at 48-49. Lucy also testified to those percentages. Tr. 2 at 10. But Lou seems not to have agreed. First, he testified that he was "if nothing else, the majority owner," then, that "the agreement we all had from the very beginning" was that once he had been repaid his investment, "we would share equally in the profits thereafter." Tr. 1 at 37.

On May 8, 2018, Lou wrote Ochello a check for $130,000 with the notation "For Home purchase 1725 24th Ave." Lou Ex. 8, ECF No. 27 at 14.  That same day, Ochello and Lucy used the check to open a business checking account for Golden Walker at Regions Bank ("Regions Account"). Tr. 1 at 123; Lou Ex. 9, ECF No. 27 at 15; Lou Ex. 10, ECF No. 27 at 16; *see also* Stip. Fact No. 8. Both Ochello and Lucy were on the account. Tr. 2 at 14.

In addition to the $130,000 opening deposit, Lou funded the Regions Account with two more checks, one for $70,000 and the other for $50,000, both written to "Golden Walker Homes LLC" on May 30, 2018. Stip. Fact No. 9. Lou wrote the checks the same day with the idea they would be deposited on different days to reduce the risk of an overdraft. Tr. 1 at 32. The memo line of the $70,000 check said "1725 24th Ave for Home purchase/repair." Lou Ex. 11. The memo line

of the $50,000 check said "1725 24th Ave Home repair/update/biz cap." Lou Ex. 12. Ochello endorsed the checks "For Deposit Only." Lou Exs. 11, 12; Tr. 1 at 130.

June 7, 2018, was the closing date for the Home purchase. Tr. 1 at 126. The amount due at closing was $105,161.05 and a cashier's check was required, Tr. 1 at 132, 184. According to Ochello, Regions told her the easiest way to get the cashier's check was for her to write a check to herself, and Regions would provide a cashier's check in that amount made out to the closing attorney. Tr. 1 at 184. And that is what happened. *See* Lou Ex. 14, ECF 27 at 20 (Regions Account check for $105,161.05 to Ochello); Lou Ex. 15, ECF No. 27 at 21 (Regions cashier's check for $105.161.05 to Evans & Monsour).

But there was one more problem: The contract for the Home purchase was in Ochello's name. Lou Ex. 7, ECF No. 27 at 11 (Contract for the Sale and Purchase of Real Estate, providing "Convey title to: Kim Ochello"). Ochello did not know she should have told the real estate company to draft a new contract with Golden Walker as purchaser. Tr. 1 at 133-34. So for Golden Walker to own the Home, title had to be transferred twice. At closing, the seller conveyed title to Ochello, then she conveyed title to Golden Walker. Stip. Facts Nos. 10, 11. The time stamps show the warranty deeds were filed within four minutes of each other the next day. Lou Ex. 16 at 1; Lou Ex. 17 at 1.

Once Golden Walker had a checking account, Ochello stopped writing personal checks for business expenses. Through October 18, 2018, Ochello wrote business-related checks totaling $55,388.66 from the Regions Account to DHI Services for a home inspection, the City of Meridian for a water deposit and a water bill, The Insurance Center for property insurance, Archer Architecture, Bailey Lumber for lumber and fence supplies, Burton Construction, and two men for yard work. Ochello Ex. 5, ECF No. 28 at 83, 87, 92, 93, 95, 100, 102, 103, 104, 106, 107, 108,

110, 116, 117. Lou does not dispute checks that on their face appear to be for legitimate business purposes. *See* Lou Br., ECF No. 46 at 16-17.

Ochello wrote other checks that Lou does not dispute.

In August 2018, she wrote a check for $830 to the apartment complex where Lou lived. Ochello Ex. 5, ECF No. 28 at 101. According to Lou, he was out of town when the rent came due, and he "obviously" repaid the money but could not remember "exactly" when. Tr. 1 at 62. Regions Account statements beginning in August 2018 show no corresponding deposit. *See* Ochello Ex. 5, ECF No. 28 at 70-78.

Lou does not dispute the two checks Ochello wrote to Lucy, one for $500 and the other for $5000. Ochello Ex. 5, ECF No. 28 at 88, 96. These checks compensated Lucy for her time spent working on Golden Walker projects. Tr. 1 at 33 (Lou as to $5000: "It was brought up to me and discussed that Lucy needed money to cover expenses related to the business itself, since she was working separately and doing this on her time outside of her work."); Tr. 1 at 90 (Lou as to $5500 total: "It was a payment for the services provided at the time.").

Lou does not dispute a $2100 check Ochello wrote to "cash" with "$1000 each Lucy/Kim – hrs worked" in the memo line. Ochello Ex. 5, ECF No. 28 at 82. Other than by this check, Golden Walker officially paid Ochello nothing—no salary, no mileage, no miscellaneous expenses, no rent for the office space she provided in her home—notwithstanding that unlike Lucy, Ochello had no other paying job. When asked whether Ochello received any compensation besides this check, Lou first equivocated then acknowledged she did not. Tr. 1 at 91 ("I don't recall exactly, but I think she was at some points in that time . . . collecting unemployment benefits, so the—so there was probably a period that she was not getting paid. That's correct.").

Lou does dispute a $4350 check Ochello wrote to herself in June 2018 with "Expenses" in the memo line. Ochello Ex. 5, ECF No. 28 at 94. Ochello testified she was "sure it was for living expenses." Tr. 1 at 138-39. She continued, "I mean, we were together in June. . . . I mean, he [Lou] told me to take whatever I needed out of there for living expenses, whatever I needed." *Id.* at 139. This testimony is credible. That Lou would have considered Golden Walker's money his to give is supported by his own testimony. *See* Tr. 1 at 72 ("I am Golden Walker Homes. I put all the financing . . . .")

Ochello was examined about other checks and debits drawn on the Regions Account. As to every other check and debit through October 9, 2018, Ochello provided a credible explanation of a legitimate business purpose.

### C. Loans

Lou wrote Ochello two checks from his personal account that he contends were loans. The first check, for $3000, he wrote in July 2018, when Ochello had been unemployed for about six months. Lou Ex. 23, ECF No. 27 at 39. The memo line says "loan." According to Lou, he also expressly told Ochello the money was a loan. Tr. 1 at 35 ("[S]he was asking for money for personal expenses and so I told her I would loan the money for personal expenses. I'm not going to give her the money."). Ochello testified emphatically that the money was a gift. Tr. 1 at 145, 146 ("The memo can say anything. There was no loan agreement. We were sleeping together. We had a romantic relationship. I mean, he was with my children. . . . I never told him I would pay him back, ever, ever."). Two months later, he wrote the second check, for $4000. Lou Ex. 26, ECF No. 27 at 43. The memo line says "loan for expenses/car note." Ochello again testified that the money "absolutely" was a gift. Tr. 1 at 152.

Ochello did not think Lou expected her to repay him. Tr. 1 at 147 ("I mean, he told me, I mean, we had many conversations and he didn't expect anything from me. Money was nothing to him. He had plenty. . . . I loved him and he loved me, I thought . . . ."). She was correct; by his own testimony, Lou expected repayment to flow from Golden Walker. Tr. 1 at 93 ("She was a partner, and because she was unemployed, I would get paid back through the earnings of the company itself."). Any notion that Ochello would personally repay him was vague and contingent on Golden Walker's success. Tr. 1 at 41 ("Hopefully when, you know, when we could start employing her as part of the company and paying her a salary in addition to letting her be owner and then I would get reimbursed [by] that method.").

### D. Breakup and Aftermath

On October 5, 2018, Ochello went to New Orleans with her ex-husband. Tr. 1 at 172-73. Lucy told Lou. *Id.* at 173. His reaction scared Ochello. *Id.* ("He was very angry. . . . I was receiving threatening texts. . . . [Lou] would go to my father's in Alabama . . . . He went to my son's which is at his father's home. Showed up at my mother's . . . She was frightened. . . . [H]e showed up at our Baptist Church that my father attends."). *Id.* Ochello's friendship with Lucy was on the rocks too. Tr. 1 at 173 (Ochello: "Lucy was showing up at my home unannounced."); Tr. 2 at 24 (Lucy: "I tried to, well, communicate with her . . . . She ignored my calls.").

On October 15, Ochello wrote a $500 check to Golden Walker Homes from her personal bank account with "checking" in the memo line and a $67,353 check to Golden Walker Homes LLC from the Regions Account with "construction payment" in the memo line. Lou Ex. 28, ECF No. 27 at 46; Ochello Ex. 5, ECF No. 28 at 114. That same day, she used these checks to open a checking account in the name of Golden Walker Homes LLC at Trustmark National Bank. *See* Ochello Ex. 6, ECF No. 28 at 126.

She moved the money because she—not Golden Walker—was liable for the tens of thousands of dollars still owed to Burton Construction and she was worried that Lucy would empty the account, leaving her solely responsible for the debt. Tr. 1 at 154-55 ("[W]e're talking 40, $50,000 worth of contractor fees . . . . Who else was going to pay that? I mean, they [Lou and Lucy] didn't care. Lucy ran to the bank to try to get the money out of there. What was she going to do with it? I mean, she didn't care that it was my name that was on that."). Whether Ochello really was the sole obligor is open to question. Lucy testified that both she and Ochello signed a $95,249 quote from Burton Construction, her recollection refreshed by a document that was not submitted into evidence. Tr. 2 at 41-42. But Lucy also testified, "I haven't received any invoices saying that I owed anything." Tr. 2 at 32. And Burton filed a proof of claim for $3616.74 in Ochello's bankruptcy case, attaching an invoice that states "Bill To: Golden Walker Home/Kim Ochello." Ch. 7 Case No. 20-00717-KMS, Cl. 3-1 at 4.

On October 17, two days after Ochello moved the money, Lou and Ochello met at a Cracker Barrel restaurant to talk. Tr. 1 at 47. Ochello had not shown up for a Golden Walker business meeting at another restaurant the day before. *Id.*; Tr. 2 at 34. And according to Lou, she told him she "had to get something off her chest." Tr. 1 at 47. The conversation did not go as either of them had planned, an altercation ensued, and Ochello called the police. Tr. 1 at 48, 174. Lou was not arrested. Stip. Fact No. 16.

Also on October 17, Ochello closed the new Golden Walker account at Trustmark and transferred the entire $67,853 into a second new checking account in her name ("Trustmark Account"). Stip. Facts Nos. 17, 18. She also transferred the Home to herself. Stip. Fact No. 20. Whether she took these actions before or after the meeting with Lou was not addressed at trial.

On October 21, Lou texted Ochello, "Good morning. I hope you got some rest. I just want to say I forgive you. . . ." Lou. Ex. 33, ECF No. 27 at 56. He was apparently unaware at that point that Ochello had transferred the Home and almost all Golden Walker's money to herself. He also was apparently unaware that Ochello had filed domestic violence charges against him. *See* Stip. Fact No. 19.[4]

Two days later, an officer of the local municipal court was waiting for Lou when he got to work. Tr. 1 at 44. The day after Lou was arrested, Ochello texted him, "Do not go to my dads house ever again. Do not go to my mothers house ever again. Do not contact me ever again. Anything you need to say you can tell my attorney . . . . I have taken legal action to stop this." Lou Ex. 33.

According to Ochello, she took Golden Walker's money for two reasons. First, she needed to pay not only what she owed Burton but also the ongoing expenses associated with any piece of real property. Tr. 1 at 177 ("I owed Burton Construction 42, $43,000. . . . I went ahead and paid more, I got another insurance, property insurance because the home was in my name . . . I still had power and water on. I paid—I was paying for all of that."). This testimony is borne out by at least the following checks: Burton Construction, $42,125.76, Ochello Ex. 6, ECF No. 28 at 146; Lauderdale County Tax Collector, $1,432.65, Ochello Ex. 6 at 157; The Insurance Center, $1,150.79, Ochello Ex. 6 at 163. Second, she personally needed money. Tr. 1 at 162 ("I had to live. My source of income was gone.").

Testimony established how Ochello spent some but not all of the money from the Trustmark Account and the less-than-$200 left in the Regions Account, which she supplemented by returning earlier-bought merchandise for credit. Relying on the bank statements to explain the

---

[4] According to Lou's post-trial rebuttal brief, the charge was dismissed on May 6, 2021, and Lou's record ordered expunged. ECF No. 48 at 7.

rest, the Court finds that Ochello spent $23,089.64 for her own purposes, including purchases from restaurants and retailers, *see* ECF No. 28 at 74-78; 139-175, and $8000 in legal fees that were either personal or unexplained, ECF No. 27 at 47, 57.

### E. Epilogue

On November 27, 2018, Lou filed a state court complaint against Ochello and Golden Walker for accounting and inspection, breach of contract/anticipatory repudiation, conversion, unjust enrichment, intentional misrepresentation/fraud, breach of fiduciary duty/per se violations of the Revised Mississippi Limited Liability Company Act, intentional infliction of emotional distress, and injunctive relief ("Lauderdale County Action"). Compl., ECF No. 1 at 16-17. After more than a year of discovery, Lou noticed Ochello's deposition for Monday, March 2, 2020. *Id.* at 20. The preceding Friday, Ochello filed chapter 7 cases for herself and for Golden Walker, thereby staying the lawsuit.

The Home became property of Ochello's bankruptcy estate. Lou, Ochello, and the Trustee in Ochello's case agreed that Lou would buy it under 11 U.S.C. § 363 for $15,000 free and clear of all liens, interests, encumbrances, and claims except for real property taxes. *See* Ch. 7 Case No. 20-00717, ECF No. 67 ("Settlement Order") at 1-2. Lou withdrew his proof of claim in Ochello's case but reserved his rights and claims against her in this adversary proceeding. *Id.* at 2. The Settlement Order also purported to assign to Lou any claim against Ochello "regarding a transfer of funds in relation to Golden Walker, LLC." *Id.*

## CONCLUSIONS OF LAW

"[E]xceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997). The creditor must prove each

required element by a preponderance of the evidence. *Hancock Bank v. Harper (In re Harper)*, 475 B.R. 540, 546 (Bankr. S. D. Miss. 2012) (citing *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991)). "'Preponderance means . . . more likely than not." *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1164 (5th Cir. 1993).

Lou seeks an exception to discharge under § 523(a)(2)(A) for $7000 in purported loans to Ochello. He also seeks an exception to discharge under § 523(a)(2)(A), (a)(4), and (a)(6) for $155,560 of the amount he says he invested in Golden Walker, calculated as his purported $258,000 total investment, ECF No. 46 at 2, minus $102,440 in expenditures that he does not dispute, ECF No. 46 at 16-17.

## I. Real Party in Interest

Lou's $258,000 investment includes not only $138,000 in checks he wrote to Ochello but also $120,000 in checks he wrote to Golden Walker, which were deposited in the Regions Account. *See* Lou Ex. 11 ($70,000); Lou Ex. 12 ($50,000); Stip. Fact No. 9. The Regions Account account holder was Golden Walker. *See* Lou Ex. 9 (Regions Account Package). Whether Lou can proceed against Ochello for allegedly misspending funds from Golden Walker's account was not addressed by either party before or during the trial. *See* 11 U.S.C.§ 523(c)(1) (providing that only "the creditor to whom such debt is owed" may request an exception to discharge of a particular debt under § 523(a)(2), (a)(4), and (a)(6)).

Both parties apparently believed, erroneously, that Lou had succeeded to Golden Walker's claim. *See* Ch. 7 Case No. 20-00717, Settlement Order, ECF No. 67 at 2. But Golden Walker's claim against Ochello was property of Golden Walker's bankruptcy estate, not Ochello's. Consequently, there was no claim that the Trustee in Ochello's case could agree to assign, meaning that Golden Walker's claim remains property of either Golden Walker's bankruptcy estate or

Golden Walker. *See* 11 U.S.C. § 554(d) ("Unless the court orders otherwise, property of the estate that is not abandoned . . . and that is not administered in the case remains property of the estate."); 5 *Collier on Bankruptcy* ¶ 554.02[3] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("Property abandoned under section 554 reverts to the debtor . . . .").

Assuming for now that Lou was a member of Golden Walker—Ochello argues under § 523(a)(4) that he was not—the question is whether Lou as a member can assert the rights of Golden Walker in this adversary proceeding. Although often framed as an issue of standing, this question goes to the prudential limitation on the court's exercise of jurisdiction over a third-party plaintiff. *Fill It Up, LLC v. MS LZ Delta, LLC*, 342 F. Supp. 3d 707, 717 (N.D. Miss. 2018) (citing *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 320 (5th Cir. 1999)). This limitation is known as the real party in interest rule. *See* Fed. R. Civ. P. 17(a) (applicable under Fed. R. Bankr. P. 7017). "The real party in interest is the person holding the substantive right to be enforced . . . ." *Fill It Up, LLC*, 342 F. Supp. 3d at 717 (quoting *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 362 (5th Cir. 2014)).

The right to object that a plaintiff is not the real party in interest may be waived. *Ensley*, 171 F.3d. at 320. Here, Ochello waived it by agreeing to assign Golden Walker's claim to Lou, even though the assignment itself was ineffective. Her waiver means any claim belonging to Golden Walker was tried by implied consent. Still, the issue warrants discussion because an LLC member proceeding on the company's claim would be entitled to only a pro rata judgment. *See Griffith v. Griffith*, 997 So. 2d 218, 223 (Miss. Ct. App. 2008) (affirming award to shareholder in closely held corporation in amount of one-half of funds misappropriated by other shareholder).

State law determines which party holds the substantive right to be enforced. *Farrell Constr. Co. v. Jefferson Par.*, 896 F.2d 136, 140 (5th Cir. 1990). Under Mississippi law, "[a] member has

no interest in specific limited liability company property." Miss. Code Ann. § 79-29-701. It follows that once Lou transferred the $120,000 to Golden Walker, he no longer had any interest in those funds. *See Gill v. Grewel*, No. 4:14-CV-2502, 2020 WL 3171360, at *8 (S.D. Tex. June 15, 2020) (ruling under similarly worded Texas statute that LLC's assets were independently and solely owned by LLC and that member therefore was not harmed by misappropriation of funds). So Golden Walker, not Lou, holds the substantive right to be enforced.

"In general, an action to redress injuries to a corporation . . . cannot be maintained by a stockholder in his own name, but must be brought by the corporation because the action belongs to the corporation and not the individual stockholders whose rights are merely derivative." *Scafidi v. Hille*, 180 So. 3d 634, 646 (Miss. 2015) (internal quotation marks omitted) (quoting *Longnecker v. Diamondhead Country Club*, 760 So. 2d 764, 768 (Miss. 2000)). This rule also applies to LLCs. *See* Miss. Code Ann. § 79-29-311(2) ("A member . . . is not a proper party to a proceeding by . . . a limited liability company . . . except: (a) Where the object of the proceeding is to enforce a member's . . . right against or liability to the limited liability company, or (b) *In a derivative action* . . . .") (emphasis added). In a derivative action, the complaint must "set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a manager or member . . . or the reasons for not making the effort." Miss. Code Ann. § 79-29-1105; *cf.* Fed. R. Civ. P. 23.1(b)(3) (setting out similar requirement, made applicable in adversary proceedings by Fed. R. Bankr. P. 7023.1). The Complaint here did not meet this requirement, notwithstanding that Lou filed it *before* entry of the Settlement Order that ostensibly assigned him Golden Walker's claim.

Mississippi law provides an exception to the requirement that a member must bring the LLC's claim derivatively. "[T]he Mississippi Supreme Court has carved out an exception to the general rule that shareholders of a corporation possess only derivative rights to proceed

individually." *Fill It Up, LLC*, 342 F. Supp. 3d at 717 (citing *Derouen v. Murray*, 604 So. 2d 1086 (Miss. 1992)). The *Derouen* exception also applies to derivative claims brought by a member of an LLC. *See, e.g., Bros. v. Winstead*, 129 So. 3d 906, 921-22 (Miss. 2014).

Under the *Derouen* exception, a derivative claim may be tried as a direct action, resulting in an individual recovery, if the court finds that doing so will not "(i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons." *Derouen*, 604 So. 2d at 1091 n.2 (quoting *Principles of Corporate Governance* § 701(d)). Here, all three requirements are met. First, there will be no multiplicity of actions. Even if Golden Walker's other member, Lucy, had a claim for nondischargeability apart from Golden Walker's, the deadline for her to bring it has passed. Consequently, any prepetition debt Ochello might have owed Lucy has been discharged. Second, creditors' interests will be accounted for by first subtracting the amount of Golden Walker's scheduled debt from the amount of misappropriated funds and then calculating Lou's judgment from the difference. Besides, any other creditor could have also filed a nondischargeability action; none did. Third, there is no recovery to be distributed. This action is for nondischargeability; there is no pot of money. As another bankruptcy court recognized, "[I]t is immaterial whether we view the plaintiff's cause as derivative or direct. . . . The corporation is now defunct. . . . [N]either the procedural hurdles normally required for shareholder derivative actions nor the concern that the corporation is the appropriate recipient of any remedy will impede consideration of the substance of the plaintiff's cause." *Sharkey v. Emery (In re Sharkey)*, 272 B.R. 574, 582-83 (Bankr. D.N.J. 2001).

Although any claim based on injury to Golden Walker is derivative, Lou also has his own claims. "In Mississippi, a shareholder or member may bring an action in his own name when he

has suffered an individual injury that is distinct from the alleged injury to the company." *Robinson v. Smith (In re Smith)*, 582 B.R 417, 423 (Bankr. N.D. Miss. 2017) (holding that if debtor fraudulently induced member to lend to the company, injury alleged as lender would be separate from company's injury or member's injury based solely on ownership interest); *see also Mathis v. ERA Franchise Sys., Inc.*, 25 So. 3d 298, 303-04 (Miss. 2009) (distinguishing between derivative claims requiring showing of injury to LLC and individual claims for breach of private agreements between members). For example, Lou asserts his own separate injury under § 523(a)(2)(A) when he argues that Ochello duped him into funding the business and loaning her $7000.

## II. Lou Was a Member.

Ochello asserts that she was the sole member of Golden Walker because only she is identified as "Member" on the Certificate of Formation. ECF No. 47 at 2, 8. She argues that there was no operating agreement and that consequently the Certificate of Formation controls. ECF No. 47 at 2 (citing Miss. Code Ann. § 79-29-123(1)). Whether Lou was a member of Golden Walker is a question of law under the Revised Limited Liability Company Act, Miss. Code Ann. §§ 79-29-101 – 1317 (2011) ("LLC Act").

The LLC Act does not support Ochello's argument. The "Member" designation appears below Ochello's name in the Certificate's "Signature" section. *See* ECF No. 27 at 10. In that location, it satisfies part of the statute's signature requirement. *See* Miss. Code Ann. § 79-29-207(2) ("The person signing the [certificate] shall state . . . the capacity in which the person signs . . . ."). The LLC Act does not require the certificate of formation to list the LLC's members. The certificate "must set forth" only three items of information: (1) the LLC's name; (2) "the information required by Section 79-35-5(a)," that is, the name and other information about the LLC's registered agent; and (3) the latest date on which the LLC is to dissolve, if the LLC will

have a specific date of dissolution. Miss. Code Ann. § 79-29-201(1). The Certificate of Formation could have listed the members. *See* Miss. Code Ann. § 79-29-201(2) (providing that certificate "may set forth any other matters the members determine to include therein."). But it did not.

A person becomes an LLC member either at the LLC's formation or on the date the LLC's records state that the person becomes a member. Miss. Code Ann. § 79-29-301(1); *see also* Miss. Code Ann. § 79-29-105(q) (providing that a "member" of an LLC is "a person who has been admitted . . . as provided in Section 79-29-301"). Golden Walker had no written records, thus no documentation of who was a member and when each member was admitted.

But the fact Golden Walker had no written records does not mean it had no operating agreement. An "operating agreement" is "an agreement . . . *written, oral or implied*, of the member or members as to the affairs of a limited liability company and the conduct of its business." Miss. Code Ann. § 79-29-105(t) (emphasis added). "An operating agreement must initially be agreed to by all of the members." Miss Code Ann. § 79-29-123(1). Consistent with these requirements, Golden Walker's operating agreement was implied in Lou's, Ochello's, and Lucy's understanding, shared from the beginning, that the three of them together would create the business, that Lou would put up the money, and that he would be repaid from company profits.

The Mississippi Supreme Court has looked to an operating agreement to decide whether a complaining party was an LLC member. *See Kilpatrick v. White Hall on MS River, LLC*, 207 So. 3d 1241, 1247 (Miss. 2016) (holding that under unambiguous terms of operating agreement, complaining party's membership interest was "nonexistent"). Likewise here, the terms of the operating agreement were unambiguous, albeit unwritten, that Lou, Ochello, and Lucy would create the business together. Consequently, Lou was a member at formation.

### III. Section 523(a)(2)(A)

"A discharge . . . does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C. § 523(a)(2)(A). The Fifth Circuit has applied different but overlapping elements of proof for each of the three grounds for an exception to discharge under § 523(a)(2)(A). *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001). A false pretense or false representation is a knowing and fraudulent falsehood describing past or current facts on which the creditor relied. *Id.* A false representation may be an express statement or it may be silence about a material fact. *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 399 (5th Cir. 2017). Similarly, a false pretense may be based on misleading conduct alone. *Demory v. Martin (In re Martin)*, 630 B.R. 766, 783 (Bankr. S.D. Miss. 2021). Actual fraud may involve a false representation but also encompasses frauds that can be accomplished without a false representation, such as fraudulent conveyance schemes. *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 361 (2016). The creditor's reliance must be justifiable, as determined by "a subjective inquiry that depends on the particular plaintiff and circumstances." *In re Harper*, 475 B.R. at 547; *see also Field v. Mans*, 516 U.S. 59, 77 (1995) (holding that § 523(a)(2)(A) requires only justifiable, not reasonable, reliance).

Lou asserts two arguments under § 523(a)(2)(A), one as to the $3000 and $4000 "loans" he made to Ochello in July 2018 and September 2018, and one as to the $155,560 portion of his investment in Golden Walker. Both arguments fail.

#### A. Investment

Lou argues that Ochello never intended to run a business with Lou, that she paid legitimate business expenses only to maintain the ruse that she was running the business, and that she

23

continued to pay legitimate business expenses after she moved the $67,353 to the Trustmark Account only to buy herself time to manufacture a defense. ECF No. 46 at 14, 15, 16 n.9, 17. This argument is a pure fabrication. As Ochello succinctly counters, "The facts simply do not show this." ECF No. 47 at 1.

## B. Loans

As to the purported loans, Lou continues with the ruse theory. He argues that Ochello tricked him into believing he was a partner in the business, thereby inducing him to write the checks for $3000 and $4000 that she had no intention of repaying. ECF No. 46 at 11.

But even if this theory fit the facts, Lou did not prove these checks were loans. *See In re Martin*, 630 B.R. at 780 ("A bankruptcy court cannot declare a debt nondischargeable until the creditor establishes the existence and amount of that debt.").

In examining Ochello, Lou's attorney focused on the "loan" notation on the checks:

Q: And the memo says loan, correct?

A: Correct.

Q: Doesn't say gift, does it?

. . . .

Q: Do you contend that this check was a gift?

A: Absolutely.

Q: But it doesn't say gift, does it?

Tr. 1 at 145. The "loan" notation on the $3000 and $4000 checks does not prove Lou lent Ochello this money any more than the "ring purchase" notation on the $3500 check proves Lou bought Ochello's ring. Lou did not expect Ochello to repay him; he expected Golden Walker to repay him.

*See* Tr. 1 at 93. Consequently, Lou did not meet his burden of proof for nondischargeability of the $3000 and $4000 "loans."

## IV. Section 523(a)(4)

"A discharge . . . does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ." 11 U.S.C. § 523(a)(4). The § 523(a)(4) exception to discharge "was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998) (quoting *Boyle v. Abilene Lumber, Inc.* (*In re Boyle)*, 819 F.2d 583, 588 (5th Cir. 1987)). "There are three separate types of debts rendered nondischargeable under § 523(a)(4): (1) debts resulting from fraud or defalcation while acting in a fiduciary capacity; (2) debts resulting from embezzlement; and (3) debts resulting from larceny." *Mid-South Maint., Inc. v. Burk (In re Burk)*, 583 B.R. 655, 669 (Bankr. N.D. Miss. 2018). Lou argues that his $155,560 investment is nondischargeable either because Ochello committed defalcation while acting in a fiduciary capacity or because she embezzled the funds. ECF No. 46 at 17 n.11

As discussed under the "Real Party in Interest" heading above, Lou brings two kinds of claims in this adversary proceeding, individual and derivative. Embezzlement implicates both the individual and the derivative claim. Defalcation while acting in a fiduciary capacity implicates only the derivative claim, even though Lou asserts that Ochello breached a fiduciary duty she owed him, ECF No. 46 at 18. *See Griffith*, 997 So. 2d at 222 (holding that when shareholder of

closely held corporation alleged that other shareholder breached fiduciary duty to him, duty was owed "first and foremost" to corporation and only to other shareholder derivatively).

As to embezzlement, Lou is not entitled to a judgment on the individual claim but is entitled to a judgment on the derivative claim. Because the derivative claim is adjudicated as embezzlement, there is no need to reach the question of defalcation while acting in a fiduciary capacity.

## A. Embezzlement

Embezzlement under § 523(a)(4) is "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Cross Point Church v. Andrews (In re Andrews)*, 560 B.R. 429, 447 (Bankr. S.D. Miss. 2016) (quoting *In re Miller*, 156 F.3d at 602). The creditor must prove the following three elements: "(1) the creditor entrusted his property to the debtor; (2) the debtor appropriated the property for a use other than that for which it was entrusted; and (3) circumstances indicate fraud." *In re Burk*, 583 B.R. at 670 (citing *In re Miller*, 156 F.3d at 603).

"To meet the definition of embezzlement there must be proof of the debtor's fraudulent intent in taking the property." *In re Miller*, 156 F.3d at 602-03. "Fraud" is not susceptible to precise definition but generally "connotes deception or trickery." *Husky Int'l Elecs.* 578 U.S. at 360 (discussing judicially established understanding of fraud in context of § 523(a)(2)(A)). To find only that the debtor "acted wrongfully in misappropriating or misusing [the property]" is not a finding of fraudulent intent. *In re Miller*, 156 F.3d at 603 ("One can wrongfully appropriate a trade secret while acting under an erroneous belief of entitlement."). "Fraudulent intent may be inferred from the conduct of the Debtor and from circumstances of the situation." *In re Andrews*, 560 B.R. at 447 (quoting *First Nat'l Bank of Midlothian v. Harrell (In re Harrell)*, 94 B.R. 86, 91 (Bankr.

W.D. Tex. 1988)). "Fraudulent intent may be negated by the fact the debtor used such funds openly, without attempt to conceal, and had reasonable grounds to believe he had the right to so use." *Great Am. Ins. Co. v. Storms (In re Storms)*, 28 B.R. 761, 765 (Bankr. E.D.N.C. 1983).

## B. Individual Claim

Lou's individual claim is based on his four checks to Ochello: $4000, notated "working capital," Lou Ex. 3; $2500, notated "For real estate purchase," Lou Ex. 5; $1500, notated "architect/[Illegible]," Lou Ex. 24; and $130,000, notated "For Home purchase 1725 24th Ave.," Lou Ex. 8. There is no evidence that Ochello misappropriated any of this $138,000.

As to the $130,000 check, the parties stipulated that Ochello deposited it into the Regions Account. The evidence established that it constituted the account's opening deposit. Lou does not argue that opening the Regions Account was a misuse of these funds.

As to the $1500 check, the evidence established that Ochello wrote a $1500 check from her personal account to Archer Architecture. Lou does not argue that Ochello should not have paid Archer.

As to the $2500 and $4000 checks, the evidence favoring Ochello is less precise but still definitive. As to the $2500 check, which Lou had notated "For real estate purchase," the evidence established that Ochello wrote a $1000 check from her personal account to Winstead Realty. Lou does not argue that Ochello should not have paid Winstead Realty. The remaining $1500 is not explicitly accounted for, but Ochello did during this same period write a $300 check from her personal account to Archer Architecture and personally pay the filing fee for the Certificate of Formation. Lou does not argue that Ochello should not have paid these business expenses. As to the $4000 check, no evidence establishes how Ochello spent this money.

But the evidence does establish that from the time Ochello lost her job at Deaconess, Lou expected her to do most of the work to get the business going, ostensibly without pay notwithstanding that he knew his gifts were her only income. Without documented compensation, Ochello provided office space in her home. Without documented mileage reimbursement, Ochello performed most of the day-to-day tasks necessary to start a business. No evidence was presented that Ochello engaged in any deception or trickery as to the $2500 and $4000 checks. Lucy worked closely with Ochello and did not testify to any concerns about misappropriation of Lou's funds during this time. Lou testified that he did not like to mix business with pleasure, but this statement is belied by the parties' course of dealing. Lou and Ochello were lovers. He gave her money for medical expenses, her daughter's tuition, health insurance, and more. There was no evidence that he expected her to account for these gifts. And there was no evidence he expected her to account for the checks he wrote her for Golden Walker—that is, not until after the breakup, when he filed the Lauderdale County Action. Consequently, Lou did not meet his burden of proof for nondischargeability of his individual claim.

### C. Derivative Claim

Lou's derivative claim arises from how Ochello spent Golden Walker's money. Lou impugns some of Ochello's spending from as early as June 2018. *See* ECF No. 46 at 21. But the first credible evidence of the intent necessary for embezzlement was on October 17, 2018, when Lou and Ochello met at Cracker Barrel and when Ochello transferred Golden Walker's $67,853 to the Trustmark Account, which was in her name, and transferred the Home to herself. These unilateral transfers demonstrate wrongdoing plus the deception that is a hallmark of fraud.

1. The Home

The $155,560 purported debt for which Lou seeks an exception to discharge includes the $105,161.05 purchase price of the Home. Lou made no argument why the Home price should be excepted from discharge. The initial purchase was not fraudulent; Lou, Lucy, and Ochello agreed that Golden Walker would buy the Home, and Ochello bought it for Golden Walker. Ochello's ultimate transfer of the Home to herself was fraudulent. But Lou now owns the Home and did not offer any reason why he should be further compensated. Discounting Lou's claim by the purchase price of the Home leaves only $50,398.95 in potential nondischargeable debt.

2. The Money

For any checks or other debits before October 17, 2018, there was no credible evidence that Ochello misappropriated funds with the intent necessary to prove embezzlement, including as to the $4350 check she wrote to herself in June 2018, which she was "sure" she would have used for living expenses, Tr. 1 at 138-39. This use was consistent with Lou and Ochello's course of dealing, only now with Golden Walker's money as well as Lou's. And Lou can hardly complain that Ochello used Golden Walker funds for living expenses when he used Golden Walker funds for his apartment rent. Whether Lucy knew that both Lou and Ochello used Golden Walker funds for personal expenses during this period was not addressed at trial, although Lucy had access to the Regions Account and could have seen the checks. Both Lucy and Lou knew Ochello was unemployed and that Golden Walker paid Lucy $6500 and Ochello only $1000 with the expectation that Ochello would do most of the work. Taken together, these facts show either that Lou and Lucy tacitly approved Ochello's paying herself off the books or that Ochello believed she had carte blanche—or both.

Even so, Ochello did not misappropriate all the $67,853 that she transferred to herself. She paid significant bills associated with the Home, if only because she owned the Home or because she was liable on a particular debt. These expenditures totaled $44,763.36, calculated as follows:[5]

| | |
|---|---|
| Unnumbered check – Burton Construction | $42,125.76 |
| Ck. No. 103 – Lauderdale County Tax Collector | 1,432.65 |
| Ck. No. 136 – The Insurance Center | 1,150.79 |
| 11/15/18 – Atmos Energy debit w/corresponding bill | 54.16 |
| | $44,763.36 |

Ochello did not establish that the remaining funds in the account were spent for business purposes. In fact, bank statements show many purchases from general retailers, women's clothing stores, and fast-food restaurants. As a result, Ochello is on the hook for $23,089.64.[6]

Notwithstanding, Lou is not entitled to a $23,089.64 nondischargeable judgment. As discussed under the "Real Party in Interest" heading above, a derivative claim may be tried as a direct action with an individual recovery only if creditors' interests are not materially prejudiced. *See Derouen*, 604 So. 2d at 1091 n.2; *see also Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 153 (5th Cir. 2015) (stating general principle under corporate and bankruptcy law that creditors are paid before shareholders). Appling this principle as if there were assets to distribute, the Court subtracts the $8350 in unsecured debt scheduled in Golden Walker's bankruptcy case from the $23,089.64 in misappropriated funds for a difference of $14,739.64. *See* Ch. 7 Case No. 20-00722-KMS, ECF No. 3 at 9 (showing $8350 in unsecured claims). One-third of $14,739.64 is $4913.21, which is all Lou would be entitled to as a nondischargeable judgment

---

[5] Ochello may have paid other Golden Walker expenses from the Trustmark Account. *See* Ck. Nos. 104, 137, 138, 139. But as Ochello argued against Lou, handwritten notations on a check do not prove the check's purpose.

[6] The Court calculated this figure from its own review and analysis of the bank statements, which Ochello entered into evidence but which neither party organized into a coherent and comprehensive factual narrative at trial. At the close of the evidence, the Court instructed counsel to submit post-trial briefs, stressing that whatever each party's legal conclusion, it should be supported by facts. Left unspoken was the expectation—unmet—that counsel would curate the facts. *See DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archeologist with the record.").

as one of three Golden Walker members. *See Griffith*, 997 So. 2d at 223; *see also Humphries v. Rogers (In re Humphries)*, 516 B.R. 856, 871 (Bankr. N.D. Miss. 2014) (holding that because debtor was entitled to fifty percent of any distribution, he embezzled only half the money he took).

But Lou is not only a Golden Walker member but also a Golden Walker creditor. Golden Walker's oral operating agreement required Golden Walker to repay Lou's investment. And Golden Walker's schedules list Lou as an unsecured creditor. *See* Ch. 7 Case No. 20-00722-KMS, ECF No. 3 at 8 (stating amount of Lou's claim as "unknown"). Consequently, Lou's claim as a creditor comes before member claims hypothetically attributed to Lucy and Ochello. Lou is therefore entitled to a nondischargeable judgment for $14,739.64 under § 523(a)(4).

## V. Section 523(a)(6)

A debt "for willful and malicious injury by [an individual] debtor to another entity or to the property of another entity" is nondischargeable under chapter 7 of the Bankruptcy Code. 11 U.S.C. § 523(a)(6). "[A]n injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *In re Miller*, 156 F.3d at 606.

In the Complaint and in his post-trial brief, Lou asserts that Ochello willfully and maliciously injured him by filing the domestic violence charges:

> The defendant not only knew that there was an objective substantial certainty of harm, but her subjective intent was to cause harm. Specifically, her intent was to harass Plaintiff Lou, cause emotional distress, financial distress in the form of attorney's fees to fight the sham criminal charges, and deter him from seeking legal recourse regarding his rights to the company.

ECF No. 46 at 25; *see also* Compl., ECF No. 1 at 26.

But at trial, Lou's attorney did not argue, much less prove, any connection between the domestic violence charges and the debt Lou seeks to have held nondischargeable:

> I think that this evidence is going to show that the plaintiff made loans to the defendant in a personal capacity. Outside of those personal loans that were made

> there was investment in a limited liability company, Gold[en] Walker Homes, in which Mr. Lou thought he was a member and had a financial interest. I believe the evidence is going to show that the defendant made promises that she knew she couldn't keep or she made promises with no intention of performing as promised and I think the evidence is going to show that she's indebted to Mr. Lou, and that those debts are nondischargeable.

Tr. 1 at 8.

Nondischargeability requires a causal connection between the debt and the debtor's alleged wrongdoing. *Cohen v. de la Cruz*, 523 U.S. 213, 220 (1998) ("It is clear that 'debt for' . . . means 'debt arising from' or 'debt on account of' . . . ."). Consequently, Lou did not meet his burden of proof under § 523(a)(6).

## CONCLUSION

Lou proved Ochello owes him $14,739.64 that is nondischargeable as a debt for embezzlement under § 523(a)(4). A separate judgment will be entered. *See* Fed. R. Bankr. P. 7058.

*##END##*